UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,    .
                            .
        Plaintiff,          .    CR No. 24-0066 (TSC)
                            .
    v.                      .
                            .
SPENCER OFFMAN,             .    Washington, D.C.
                            .    Friday, July 12, 2024
        Defendant.          .    11:00 a.m.
. . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        JACK E. BURKHEAD, AUSA
                           U.S. Attorney's Office
                           601 D Street NW
                           Washington, DC 20530

For Defendant:             JANE IMHOLTE, ESQ.
                           Office of the Federal Defender
                           188 W. Northern Lights Blvd.
                           Suite 700
                           Anchorage, AK 99503

Court Reporter:            BRYAN A. WAYNE, RPR, CRR
                           U.S. Courthouse, Room 4704-A
                           333 Constitution Avenue NW
                           Washington, DC 20001



Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

1                P R O C E E D I N G S

2                (Via Videoconference)

3          THE DEPUTY CLERK:  And we're on the record

4    in criminal case 24-66, the United States of America versus

5    Spencer Offman.  Starting with government counsel, please

6    state your appearance for the record.

7          MR. BURKHEAD:  Good morning, Your Honor.  Jack Burkhead

8    on behalf of the United States.

9          THE COURT:  Good morning.

10         MS. IMHOLTE:  Good morning.  Jane Imholte on behalf of

11   Spencer Offman, who is present.

12         THE COURT:  Good morning, Mr. Offman.  Can you hear me

13   okay?

14         THE DEFENDANT:  Yes, Your Honor.  Good morning.  This

15   is Spencer Offman.

16         THE COURT:  Okay.  Good morning.

17      Do we have anyone else on the call?

18         MS. BROUGHTON:  Good morning, Your Honor.

19   Candace Broughton on behalf of the probation office.

20         THE COURT:  Good morning.

21      Okay.  And Ms. Imholte, are you in Alaska, or where are

22   you?  Or Washington state?

23         MS. IMHOLTE:  Well, I reside in Alaska, but I'm with

24   my client here in Oregon.

25         THE COURT:  Oregon.  That's right.  I knew you were out

1      of the Alaska office.  It's a little early where you are,

2      I guess.

3          We are here for the sentencing of Mr. Offman, who has

4      pleaded guilty to entering and remaining in a restricted

5      building or grounds in violation of 18 U.S.C. § 1752(a)(1).

6          In preparation for this sentencing, I have received and

7      reviewed the presentence report and sentencing recommendation

8      from the probation department, as well as the plea agreement

9      and statement of offense that Mr. Offman executed along with

10     his counsel and the government, and sentencing memoranda

11     that I have received from the government and the defense.

12         Attached to that, to the defense memoranda, were several

13     emails from various individuals in support of Mr. Offman, and

14     I've also reviewed those.  So that's what I've looked at in

15     preparation for this.

16         So let me first begin with the presentence report, which

17     the final report and sentencing recommendation were filed on

18     June 27 of this year.  The report notes objections from the

19     defense and for the court's consideration, none from the

20     government.  Is that correct, Mr. Burkhead?

21              MR. BURKHEAD:  Yes, Your Honor.

22              THE COURT:  Okay.  So first let me start with the

23     factual recitations in the presentence report.

24         Mr. Burkhead, you have no objection to any of the factual

25     statements set forth in the report; is that correct?

1          MR. BURKHEAD:  Correct.  No objections from the

2     government, Your Honor.

3          THE COURT:  And do you plan on presenting any testimony

4     or evidence as part of this sentencing?

5          MR. BURKHEAD:  No, Your Honor.

6          THE COURT:  Okay.  Mr. Offman, are you fully satisfied

7     with the services of Ms. Imholte as your lawyer?

8          THE DEFENDANT:  Yes, Your Honor, I am.

9          THE COURT:  Have you had enough time to talk with her

10     about the presentence report and the probation department's

11     recommendation?

12          THE DEFENDANT:  Yes, Your Honor, I have.

13          THE COURT:  Have you gone over the presentence report

14     with your lawyer?

15          THE DEFENDANT:  Yes, Your Honor, I have.

16          THE COURT:  Okay.  Ms. Imholte, have you and Mr. Offman

17     read and discussed the presentence report?

18          MS. IMHOLTE:  We have, Judge.

19          THE COURT:  Now, I understand you have an objection to

20     paragraph 29, which states: "In April 2022, a tipster

21     contacted the FBI to provide images of Spencer Offman moving

22     the barricades at the Capitol, and the investigation was

23     reopened to search for additional footage."

24     That paragraph is then followed by two images depicting an

25     individual identified as Mr. Offman holding up a barricade,

1    and the objection states that Mr. Offman did not actively move

2    the barricade.  Is that the objection, that he is -- you're

3    not depicting that the photograph is somehow not him, are you?

4           MS. IMHOLTE:  No.  No.  You are correct.

5           THE COURT:  There's a photograph of him holding up the

6    barricade, but you're saying he did not -- what do you mean

7    "did not actively move it"?  I mean, to lift it up, you've got

8    to move it, right?

9           MS. IMHOLTE:  It was more an act of inertia rather than

10   an act of will.  It was moving over his head, and he continued

11   to move it.  I addressed it in my sentencing memorandum.

12          THE COURT:  Well, I think that's more of how you

13   characterize that language.  I'm not -- I'm going to overrule

14   the objection and allow the language to remain in there.

15   Certainly, you're free to address how that language should be

16   interpreted in your allocution, and as I've seen in your

17   sentencing memorandum as well.

18      Other than that, are there any other disputed issues of

19   fact; that is, any other factual statements as set forth in

20   the report?

21          MS. IMHOLTE:  No, Judge.  Thank you.

22          THE COURT:  Okay.  Having already dealt with the

23   defense objection to the description of his contact with the

24   barricade, I will accept the factual recitation as set forth

25   in the presentence report regarding the circumstances of the

offense, and therefore the facts as stated in the report will
be my findings of fact for the purpose of the sentencing.

Now, moving on to the guidelines determination, the
presentence report lays out the probation office's calculation
of the advisory guideline range that applies in this case, and
that calculation was done using the 2023 guidelines manual and
is as follows:  Beginning with the guidelines offense level --
and Mr. Offman, have you been through this with your lawyer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And I believe you have -- other than that
previous offense which involved driving while impaired, you've
never appeared in federal court before this case, have you?

THE DEFENDANT:  That is correct, Your Honor.

THE COURT:  All right.  So I'm going to go through
now -- the sentencing guidelines are not mandatory, but they
apply to every criminal case, except for certain classes of
misdemeanors, and they apply in your case.  And I'm required,
as every judge is, to go through them and consider them in
every case, which is what I'm doing now.

I will tell you that, as you know from discussing with your
lawyer, it's very formulaic.  There are a lot of numbers, you
know, discussions of factors and ranges and so on that I have
to do this calculation.  It does not mean that I don't
consider you as a person, as an individual, and your
background and characteristics as well.  This is just a

1    calculation that I must do in every criminal case.

2        All right.  So the applicable guideline in this case is

3    §2B2.3, which has a base offense level of 4.  That base

4    offense level is then increased by two levels under

5    §2B2.3(b)(1)(A) because a trespass occurred at a restricted

6    building or grounds, which brings it to 6.

7        The government has also represented that Mr. Offman has

8    demonstrated acceptance of responsibility in a manner that

9    entitles him to a two-level reduction under §3E1.1(a).

10   Therefore, before I consider any departures or variances, the

11   total offense level is 4.  Is there any objection to that

12   calculation of the offense level, Mr. Burkhead?

13           MR. BURKHEAD:  No objection, Your Honor.

14           THE COURT:  Ms. Imholte?

15           MS. IMHOLTE:  No objection.

16           THE COURT:  Okay.  Moving on to the criminal history

17   category, the presentence investigation found that Mr. Offman

18   has one prior conviction that receives criminal history points

19   in the guidelines manual and that this conviction gives him a

20   criminal history subtotal of 1, which puts him in criminal

21   history category I.  Any objection to this criminal history

22   calculation, Ms. Imholte?

23           MS. IMHOLTE:  No.  Thank you.

24           THE COURT:  Mr. Burkhead?

25           MR. BURKHEAD:  No objection, Your Honor.

 1          THE COURT:  Based on the offense level and criminal

 2     history category I've just discussed, the presentence report

 3     calculates the guidelines sentencing range to be zero to six

 4     months of imprisonment.

 5          Now, having determined the applicable guideline range,

 6     I will consider any applicable departures.  The presentence

 7     report doesn't include any departure grounds, and in the plea

 8     agreement, both parties agreed that there are no grounds for

 9     imposing a sentence outside of the guidelines range that is

10     based on the policy statements in the guidelines manual.

11          Is that your understanding, Ms. Imholte?

12          MS. IMHOLTE:  It is, Your Honor.

13          THE COURT:  Mr. Burkhead.

14          MR. BURKHEAD:  Yes, Your Honor.

15          THE COURT:  All right.  Now, 18 U.S.C. § 3553(a), which

16     lists all the factors I have to consider at sentencing, one

17     of them is I'm required to consider the statutory framework,

18     statutory penalties of the charges to which Mr. Offman has

19     pleaded guilty.

20          The charge of entering or remaining in a restricted

21     building or grounds, in violation of 18 U.S.C. § 1752(a)(1),

22     carries a statutory maximum penalty of one year of

23     imprisonment.  There is no mandatory minimum sentence.

24          Mr. Offman is also eligible for a sentence of up to five

25     years of probation, and the guidelines range for a sentence of

1      probation is up to three years.  If a term of imprisonment is

2      imposed, the statutes provide that Mr. Offman faces a

3      supervised release range following imprisonment of up to one

4      year, while under the guidelines that range is also a year.

5          The statute of conviction sets a maximum fine of $100,000,

6      while the guidelines fine range is between $500 and $9,500.

7      Special assessment of $25 is mandatory.  And as part of his

8      plea agreement, Mr. Offman has agreed to pay $500 in

9      restitution to the Architect of the Capitol.

10         Counsel, have I stated accurately the statutory framework

11     under which we're operating?  Mr. Burkhead?

12             MR. BURKHEAD:  I believe you have, Your Honor.

13             THE COURT:  Ms. Imholte?

14         MS. IMHOLTE:  Yes, Your Honor.

15             THE COURT:  Okay.  As you all know, the probation

16     office has issued a recommendation for a sentence in this

17     case.  Probation office's recommendation is 36 months of

18     probation, $500 in restitution, the mandatory $25 special

19     assessment.  As you all know, that recommendation is not

20     binding on the court.

21         All right.  At this point I would like to give the parties

22     an opportunity to address the court and to speak on any

23     factors that you think merit my special consideration.

24     Mr. Burkhead.

25             MR. BURKHEAD:  Thank you, Your Honor.

1    And I know the court has read the government's sentencing

2    memorandum, so I do not want to regurgitate all of that.  But

3    what I would like to do here is highlight some of the unique

4    factors in this case that apply under 3553(a) that warrants,

5    in the government's view, our recommendation of 45 days of

6    incarceration to be followed by one year of supervised release,

7    60 hours of community service, and $500 in restitution that

8    was agreed upon as part of the plea.

9    I want to start by --

10    THE COURT:  I'm sorry, Mr. Burkhead.  Let me interrupt

11    you.  Are you also asking for a fine?

12    MR. BURKHEAD:  We're deferring to the court on the

13    fine.  We're not affirmatively asking for a fine, however,

14    Your Honor.

15    THE COURT:  Okay.

16    MR. BURKHEAD:  All right.  I'm going to start by the

17    Senate Wing door where Mr. Offman entered.  And as the court

18    knows from the PSR and the sentencing memorandums, Mr. Offman

19    opted on January 6 to enter the Capitol through a broken

20    window.  Entered it through a broken window and exited through

21    the same window.  And what is -- there's probably many things

22    notable about his choice to do that, but one of the notable

23    facets is that there was a perfectly good doorway immediately

24    adjacent to the broken window in which Mr. Offman entered and

25    exited.

1          THE COURT:  You're not suggesting that it would have

2    been okay for him to go through that doorway, are you?

3          MR. BURKHEAD:  I am not at all.  He would have been

4    committing a crime if he would have been going through the

5    doorway at all.

6          THE COURT:  I've had a number of people in front of

7    me convicted for walking through those doorways.

8          MR. BURKHEAD:  And I was not suggesting that at all.

9    What I am suggesting is that there's a certain message

10   involved by going through the broken window that he is -- not

11   only has perfect knowledge that what he is doing is illegal,

12   he is willing to defy norms and the law to make whatever

13   statement he was trying to make that day.  There's a certain

14   emphasis by going through a broken window that puts a

15   punctuation mark on Mr. Offman's conduct that day.

16     I also want to speak for a moment about the metal bike rack

17   that was addressed both in the government's memorandum and the

18   defense.  I believe Ms. Imholte has already touched upon it

19   today that the defense view is that it was -- I think the

20   words that were used already this morning was "nothing more

21   than inertia" that accounts for the photograph that the court

22   has seen of Mr. Offman with the bike rack above his head and

23   his arms extended, supporting it in his effort to, in the

24   government's view, to move it forward.

25     And I don't in any way mean to be cavalier by saying this,

1  or chippie by saying this, but to make the claim that it's

2  just inertia and he was just supporting it to protect himself

3  seems to be too cute by half.  It certainly raises the

4  question, what in the world was he doing under the bike rack

5  in the first place if not to assist in moving it out of the

6  way.  And the clear inference that can be drawn is that he was

7  moving it out of the way in an effort to both clear the path

8  for himself and other rioters to get to where they wanted to

9  go that day.  The inference that he was just doing it to

10  protect himself, in the government's view, is not supported

11  by common sense.

12      Moving on to the 3553 factor of the history and

13  characteristic of the defendant, he's got two prior contacts

14  with law enforcement, both DWIs, one occurring before January

15  6, 2021, and the other occurring afterward.  There was about a

16  six-year span between the two.

17      With the first DWI, I'll confess to the court I'm not

18  entirely certain what sentence he received for that offense.

19  According to the PSR, he received 93 days' incarceration or

20  a large fine and also 12 months of probation.  I don't know

21  whether there was an actual sentence of incarceration or not

22  as part of that first offense.  History and experience tells

23  me there almost certainly wasn't for a first DWI offense, but

24  I can't really tell from the PSR.

25      What is apparent, however, is that Mr. Offman wasn't

deterred by whatever sentence he received his first go-round because he picked up the same offense just a couple of years later.  And why that is important is that Mr. Offman is asking for probation today when we already know that probation doesn't deter him.  It's not a specific deterrent to him because he picked up a second DWI.

So if we're going to breathe life into that 3553(a) factor, then I would respectfully suggest to the court that the government's recommendation of 45 days of incarceration along with the other aspects of the sentence that we're requesting will do more, and perhaps far more, to specifically deter Mr. Offman than would the sentence that he is requesting.

And the final factor I want to talk about is Mr. Offman's lying to the agents who initially contacted him.  Before I discuss that, I want to first acknowledge that the government stands by its representation to the court that he has accepted responsibility in this case, and, in fact to his credit, he did so really quickly.  It was not long after he was charged that he, to his credit, decided to enter the plea of guilty that's before this court.

However, it should not be lost on this court, despite the speed in which Mr. Offman opted to enter a guilty plea, that was not plan A.  Accepting responsibility was not plan A for him.  It was plan B.  Plan A was to try to lie his way out of this when the federal agents contacted him.  And he told them

1    a series of untruths that day, which actually almost worked

2    for him.  FBI did initially close the investigation until

3    further evidence was developed that he was in fact doing

4    things on January 6 that he didn't acknowledge to the agents

5    that resulted in the charges that are before this court.

6         So it's for the totality of all of those factors, Your

7    Honor, that the United States is requesting the sentence that

8    we are.  I have nothing else, no further argument for the

9    court, but I'm certainly happy to answer any questions that

10   you may have.

11        THE COURT:  I don't have any questions.  Thank you,

12   Mr. Burkhead.  Ms. Imholte?

13        MS. IMHOLTE:  Thank you, Judge.

14     I have spent quite a lot of time getting to know Mr. Offman

15   since this case was charged, and I can report to the court

16   that he is one of the most guileless clients I think I've

17   represented, and I think you'll hear in his allocution some

18   of that.

19        As counsel noted, Mr. Offman did take speedy accountability.

20   I don't know if the court will recall.  I don't think

21   Mr. Offman had seen very much in the way of discovery when he

22   decided to plead guilty.

23        THE COURT:  I remember that.

24        MS. IMHOLTE:  He wanted to plead guilty right away

25   because he didn't want to be untruthful and deny his

1    involvement.  He was untruthful when initially encountered,

2    and he will explain that to you, Judge.  It had to do with --

3        THE COURT:  I'm sorry.  Wait, wait, wait.  Did you just

4    say he was truthful when he was initially interviewed by the

5    FBI or was untruthful?

6        MS. IMHOLTE:  No, untruthful.  That's correct.  That

7    he did minimize and try to deny his involvement out of fear

8    for losing a just-secured promotion.  Not an excuse but an

9    explanation.  And explanations, obviously, are going to differ

10   in the adversarial system here.  That's why we have it.  And

11   while it may seem cute, I think it is a valid argument with

12   respect to the bike racks, Judge.  They were moving.  And I

13   don't mean to minimize what they were.

14     But as I noted in my sentencing memorandum, it's similar to

15   a body surfer at a concert or a beach ball at a concert.  I

16   don't know that my client had any ability to stop the momentum

17   of that rack going over his head.  I don't want to get into it

18   too much, because I don't know that it's that significant of a

19   factor for the court, but I just want to point out that it's a

20   valid explanation, not one that's meant to be coy.  And you'll

21   hear about that from my client as well.

22     Mr. Offman was caught up in a moment that he sought, to a

23   certain extent, but one of the things that distinguishes him

24   from all of the cases that I was reading in preparation for

25   his sentencing -- and I noted some of them in my memorandum,

1    Judge, is he did not -- unlike so many others who appeared in

2    your court and elsewhere, there was no lead-up to it like so

3    many others on social media.  There was no live broadcasting

4    at the time.  There was no boasting afterwards as some did to

5    the media but also to their social media followers. I think

6    that weighs fairly heavily in favor of probation's

7    recommendation.

8        The government asserts, without any evidence, that

9    Mr. Offman was putting a punctuation mark on a message, and

10   I wish to challenge that and push back that he was hoping to

11   deliver any message at all rather than being caught up in a

12   moment and observing seeing what was going on and exiting

13   fairly quickly as compared to other people.

14       Additionally, he left the grounds at that point, unlike

15   others who re-entered.  And Mr. Offman had no message that

16   day.  He had, I think, what is a driving force in his life:

17   a curiosity and a desire to have experiences.

18       One of the things that I find most unique or interesting

19   about my client is his job at Kroger.  He has used it to see

20   the world, or the United States.  Coming from a small town in

21   Michigan, moving out here to the West Coast all by himself,

22   not knowing anybody, he's going to continue to relocate when

23   he feels ready to move to various parts around the country.

24       And as I noted multiple times, he's had this career going

25   on 15 years.  Any period of incarceration may put that in

peril.  But it is one of the -- I find it a really telling

life choice that he selected a job that he loves and that he's

good at, but also that allows him to expand his horizons.  And

he has learned quite a lot since the three years that this

offense occurred and has had his worldview broadened by being

out here and away from home and meeting new folks.

I don't want to belabor my arguments in the sentencing

memorandum, Judge, but Probation does recommend that

Mr. Offman not serve any time in custody, and I think the

3553 factors support that.  I know that disparity between

defendants is only one of the factors, but given the number

of people who had much more egregious behavior on that day

receiving probation, I think my client should be the benchmark

for who does get probationary sentence and not a sentence of

detention.

As I noted, if the court does wish to impose detention, I

would urge them to contemplate home incarceration.  If there

is a period of detention ordered, my client would wish to

serve it at the Sheridan, Oregon, facility.  But I do think

that if anyone warrants a probationary sentence, it is my

client.

I wish to briefly address the fact that the government

says probation doesn't deter him from committing offenses.

I think that's somewhat of a specious argument given that

you're talking about a DUI.  That's a very different offense,

1    involving a substance abuse issue that my client has been

2    addressing.  He's been sober for a year and a half and totally

3    compliant with his DUI probation.

4       So Mr. Offman will not be back in your court or any court.

5    He's been very successful and had a lot of personal growth

6    because of his treatment for alcohol, and, as I noted, he's

7    living just a modest, healthy, quiet life out here in the

8    beautiful Oregon coast.  And if you don't have any questions

9    for me, my client would like to address the court.

10          THE COURT:  Thank you, Ms. Imholte.

11       Mr. Offman, when you pleaded guilty, I told you, and I'll

12    remind you now, that you would have an opportunity — an

13    absolute right, actually — to speak at your sentencing, but

14    you also have an absolute right not to speak.  And if you

15    don't want to say anything, you don't have to and I won't hold

16    that against you, but if you do want to say something, now is

17    the time.

18          THE DEFENDANT:  Yes, Your Honor.  I wrote down a small

19    speech, if I may present it to you.

20          THE COURT:  You absolutely may.  The only thing I'll

21    caution you on is we tend to speed up -- I do, most people

22    do -- we tend to speak faster when we read.  So if you could

23    just make sure you don't speak too quickly so that the court

24    reporter who is taking this down can get everything down.

25    Go ahead.

1          THE DEFENDANT:  You got it.  Yes, Your Honor.

2     On January 6, I initially went to D.C. not knowing what to

3     expect but rather seeking out an adventure.  I heard through

4     multiple media outlets that it was going to be one of Trump's

5     most exciting speeches and it was going to be, quote-unquote,

6     big.  I had no idea what big meant, but I sure wanted to find

7     out.

8     I bought a two-way plane ticket to fly in on the day of the

9     speech and to fly out the day after.  I traveled by myself, as

10    I have all of my other adventures.  Once I arrived to D.C.,

11    there was more people than I have ever seen in one gathering

12    in my whole life.

13    I'm going off my memory on this from three years ago.

14    Before the speech was over, I seen mass herds of people walk

15    in one direction mass after mass.  Curiosity led me to see

16    where everyone was headed.  I seen the crowds of people get

17    loud.  I seen them get destructive.  I seen them get riled up,

18    and I still pursued further as they pushed back one barricade

19    after the next.

20    I feel as though it is important to elaborate on this

21    detail.  The picture of the barricade over my head with my

22    mouth gaping open is captioned out of context.  I did not pick

23    that barricade up with the crowd; rather, the barricade was

24    passed down to me from a large crowd of a hundred different

25    hands.  Looking in an upward direction, I see a big metal

object heading towards my head.  I put both hands up to keep
it shuffling down the crowd.  That's no justification,
mentioning I did not pick up the bike rack.

   I pursued the crowd as far as going inside of the Capitol.
The main entryway I think it's called.  The picture of me with
the bandana over my face was not to conceal my identity, but
rather an attempt to prevent myself from breathing in tear
gas.  Again, no justification behind the action, but those
were my thoughts, covering my face.

   After taking three or so selfies and being in the first
room in the Capitol, I then realized enough is enough.  The
best way I can describe this situation was if I was in a movie
theater and the movie was playing and I didn't want to get off
of my seat and not see the end of the movie.  It go too
chaotic inside that first room of the Capitol, and that's when
I took off as quick as I could and found my way back to my
hotel -- (Interruption by court reporter.)  Oh, I'm sorry.

        THE COURT:  Yes.  That's what I warned you about.
We do tend to speed up.  If you could just slow down a bit,
Mr. Offman.

        THE DEFENDANT:  Your Honor, I plead guilty because I
know I need to take accountability.  Without accountability,
I can't learn from my mistakes.  And if I can't learn from
my mistakes, I can't grow as a human being and as a soul.
I believe we are always meant to be growing throughout our

1    lives, but I feel as though it's extremely important to

2    mention what I take accountability for.

3        My intentions of being there on January 6 were not

4    malicious, destructive, or even one-sided.  I honestly went

5    there for the adventure, but I take accountability on

6    trespassing on grounds that I knew I should not have been on.

7    I knew every single person should not have been on there.

8        I can honestly say, though, that I wanted no part in the

9    destruction.  It was observing -- and I didn't write this

10    down.  I take accountability, and through my therapy through

11    my DUI, I realize I'm a risk taker, and I take accountability

12    in not seeing the balance of the good risks in life that allow

13    you to get promotions and bad risks that lead you into

14    situations such as this.

15        If I have time, I would now like to tell you where I am now

16    as a person.  I believe the past three years for me I have

17    grown spiritually more than in my whole life.  Back in August

18    in 2021 I left my hometown in Michigan to take a leap of

19    faith.  I moved out west not knowing a single soul out here.

20    I got a job transfer through my job at Kroger that I'd been

21    with for 15 years now.  This has been a journey of trial and

22    error and plenty of obstacles, but I wouldn't change anything

23    from it.  I believe there is a learning situation behind every

24    encounter.

25        I moved from Michigan to Colorado to Utah to Washington to

where I am now in Oregon.  Each place not knowing anyone and

traveling through the channels of the Kroger Corporation.

I originally started this journey to be adventurous and see

different, miraculous wonders of this country.  But I

eventually learned that the friendships that I made with those

who were once strangers and through time accepted me into

their families as one of their own is by far the best part...

(Pause.)

THE COURT:  Take your time.

THE DEFENDANT:  Each person I lived with -- sorry.

MS. IMHOLTE:  Take a deep breath.

THE COURT:  It's all right.

THE DEFENDANT:  I wasn't expecting to do this.

I apologize.

THE COURT:  It happens.

THE DEFENDANT:  Each person that I've lived with and

worked with has a different way of thinking and it has opened

up my mind to human life from different angles.  From

coworkers to managers to landlords and roommates, meeting

these people and gaining their most moral support has been the

most incredible part of this journey that I love being on, and

most stay in touch to continue seeing how I'm doing.

Your Honor, I am ready to face the consequences that you

impose on me today.  Therefore, I can officially own up to

what I've done, learn from it, and most importantly, continue

1    to grow.  Thank you sincerely for hearing me.  Sincerely,

2    Spencer.

3            THE COURT:  Thank you, Mr. Offman.

4      Now it's my turn to do what I always say, which is true,

5    the most difficult part of my job but which is to impose a

6    sentence that is sufficient but not greater than necessary to

7    comply with the purposes of sentencing.  I have to do that in

8    every criminal case.  These purposes include the need for my

9    sentence to reflect the seriousness of the offense, to promote

10   respect for the law and to provide just punishment, to deter

11   criminal conduct, to protect the public from future crimes you

12   might commit, and to promote rehabilitation.

13     I must also consider the nature and circumstances of the

14   offense, the defendant's history and characteristics, the

15   types of sentences available, the need to avoid disparity, the

16   need to provide restitution.  I've considered all of these

17   factors, some more than others, because in every case some

18   factors will weigh more heavily, and I've done that here.

19     Actually, I usually start with the nature of the offense,

20   but I'm going to start with your characteristics as an

21   offender.  It is clear to me, both from reading the sentencing

22   memoranda, the presentence report, hearing from you today, the

23   things that others have said about you, that you are a seeker

24   and someone who is moving through life and trying to learn and

25   grow.  And that is to your credit.

1    One of the great things about this country is that people

2    move around.  They find the place where they can put down

3    roots, or they keep moving around and learning more about the

4    very big country we live in.  And you seem to have been, and

5    continue to be, on a journey of growth and exploration and

6    self-discovery, and you're to be commended for that.  You're

7    actually in the right part of the country for that.

8    But it's a big country, and there are all kinds of people

9    and places to see and things to do.  So you're commended for a

10   level of introspection and self-awareness that I see and I've

11   heard about you're interested in healthy eating and healthy

12   living and all those things, and it appears that you're

13   working towards your sobriety, which is absolutely essential.

14   If you are going to grow as a person, you have to learn to

15   deal with addictions and dependencies on substances that make

16   you make bad choices.  So you're to be commended for that, for

17   all of that.

18   You know, you've had a long, long career with an

19   organization that has allowed you to travel and fulfill your

20   desire to move around the country, and where you seem to be a

21   very valued employee, and I am hoping that this sentence does

22   not interfere with that and you continue to work for a company

23   that you appear to be very loyal and devoted to.  So there's a

24   lot that is positive about your life and that I think will

25   continue to be that way.

But I also have to talk about the nature of this offense, because every time you refer to this as "an adventure," I sort of, in my mind's eye, go back to what I and a good number of people living in this country were seeing on January 6.  It was not an adventure.  It was horrifying.

And maybe someone seeking new and different experiences being there and the electricity of the crowd and the energy of the crowd and the people and everything that was going on was stimulating and exciting, but I can tell you, Mr. Offman, for those of us who were watching from home, to those law enforcement officers who were standing there outnumbered, wondering if they were going to get killed trying to fend off objects being thrown at them, weapons being used against them or objects being used as weapons against them, and a crowd screaming the most horrible things you can imagine, and to the people who were inside that Capitol building trying to do their jobs who were hiding under desks and making frantic calls to their family out of fear that they would never speak to them again, this was not an adventure.

And I don't hear in your words an understanding of the seriousness of what was happening on January 6.  I think you're able in your life to detach from emotion and sort of just observe, and that's sometimes is a good thing.  But it sometimes isn't, because far from being an adventure or something to simply watch and look and see, there were people

carrying Nazi flags.  There were people shouting the most
virulent and offensive statements.  There were people among
you defacing the U.S. Capitol, destroying property,
desecrating the center of our government.

And I'm not saying for a minute that you condoned that
or had you participated in that.  If so, you'd be here
pleading guilty to a felony.  So, obviously, you didn't.  But
it was no adventure.  It was a violent attempt to stop the
peaceful transfer of power, a tradition that has continued
unbroken since the founding of this country.

And so it may have looked to you like, whoa, this is
cool, this is different, this is something, a new experience.
That may be true.  But it wasn't that way to the people
who were afraid they were going to get killed.  There were
flipping four suicides from the events of that day, from the
trauma that was inflicted to the law enforcement officers.
Two people died, at least two, one from amphetamine
intoxication and then another from a heart attack.  And then
someone was shot.

The effects of that day are still being felt.  I hear from
police officers and Capitol Police officers all the time who
talk about the effect it's had on their lives and their
interaction with their children and with their families and in
crowds.  I've heard from officers who had to take early
retirement.  I've heard from officers who are still struggling

1    with PTSD symptoms.  And one officer came and told me he

2    couldn't raise his arm above his shoulder, and he's had to

3    retire from a job he loves.  Most shockingly, we've had law

4    enforcement officers who are still getting vile threats and

5    being called names for doing their job that day.

6        So while I understand your characterizing this as an

7    adventure, I want to make it clear to you that this was

8    serious.  It was tragic.  It could have been much, much worse.

9    We're still feeling the aftereffects as we stare down the

10   prospect of another election that promises to be -- oh, who

11   knows.  So I didn't hear that from you, and I didn't hear from

12   you an appreciation of what the people who were there trying

13   to defend the Capitol were dealing with.

14       And so I'm going to mention this business of the bike rack

15   going above your head, like your lawyer mentioned, a beach

16   ball or crowd surfing.  Here's the thing, Mr. Offman:  Those

17   bike racks that were being passed along over your head, as

18   well as the other objects that were being passed along by the

19   crowd, were being passed along to be weapons against officers

20   who were fighting for their life.

21       They weren't being passed along to reimpose the barricade.

22   They were going to be used as weapons.  And I don't know how

23   you could not have known this, but certainly every -- everybody

24   there who allowed these barricades to be passed over their

25   heads and facilitated that facilitated the attacks against

that small but incredibly brave and determined number of law
enforcement officers who were simply trying to stay alive and
protect the people inside that building.  This is no concert.
Those barricades were being used to hurt people or try and
hurt people who were just trying to do their job.

Similarly, Mr. Burkhead's point about the broken window is
a valid one.  It's true, I've had people plead guilty and be
sentenced for walking through the doors.  Everybody who went
in that building knew they shouldn't have been in there.
Everybody.  There was no way you couldn't know.

You just said you covered your face because of the tear
gas.  Well, why is there tear gas?  There was tear gas because
they were trying to disperse the crowd because they shouldn't
have been there.  And so your climbing through that window,
which was broken, is a sort of a punctuation mark.

It does serve to display the determination that you had to
get inside that building.  You know, it does take a bit more
exertion and determination to climb through a broken window
than it does to walk through a door, despite the fact that
you're forbidden from doing both things.

So it's not just, oh, look what's happening; let me wander
over and check it out.  You were active in this event.  You
may not have intended to be active, but let me make it clear
that your presence there in the crowd, in that building,
helped to make sure that that riot almost succeeded.  Because

two people can't riot.  So when you saw what was going on and
you saw that mob and you decided I'm going to join them, you
helped them by your presence.  You helped them, and you helped
terrorize and terrify the people who were trying to keep that
building safe.  And it was no adventure to them.

With regard to the need to avoid unwarranted disparity,
I talk about this all the time.  I do look at other cases in
every instance, but I do look at my own, and I remember almost
all of these cases.  And every single case I have, I look at
all of the factors for each one.  I've given sentences -- you
know, odd numbers, 12 days or whatever -- because I do believe
the sentence should fit not just the crime but the offender
and their participation.

And these January 6 cases are sort of unique.  They're not
your typical misdemeanor cases.  They're not sort of the
typical guideline-range cases.  So I've looked at the other
cases that both your lawyer and the government have cited,
and I've also taken into account the fact that you were not
truthful with law enforcement when you were first interviewed.

I mean, I've raised two children.  It's sort of human
nature to deny culpability.  I don't think it means that
you're a horrible person or a hardened criminal.  It means
you didn't want to get in trouble, and you minimized and
falsified information about your participation.  I do take it
into account, because frankly, if there was true remorse about

1    what you did, you would have fessed up, and you didn't.

2         And as Mr. Burkhead said, it almost worked.  It took a

3    year for the FBI to get information that indicated you weren't

4    telling the truth and you were there and your participation

5    was more than you indicated.  So that's a factor I'm

6    considering.

7         But the other thing is I haven't heard you say you wish

8    you hadn't done it.  I've heard you say, here's why I did it.

9    It was sort of an adventure and an experience and I had it,

10   you know.  Done.  Over.  But I haven't heard you say, I wish

11   I hadn't done it; I realize now that what I did was wrong.

12   I haven't heard that.

13        And maybe you do feel that way, but I didn't hear that

14   in your very eloquent statement to me.  And I hope you do.

15   I hope, if nothing else -- you talk about your struggle with

16   sobriety and your desire to stay sober, and I know that part

17   of that is making amends, accepting responsibility.  You know,

18   there are steps.  I don't know if you're in a 12-step program,

19   but there is a process.

20        And so just as in that case, there's a process here for

21   rehabilitation, and part of that is owning up to what you did

22   and realizing the error of what you did.  And I hope it's

23   there.  I don't know, but I hope you have a sense now that

24   that was a terrible thing you participated in.

25        All right.  I have considered my previous sentences in this

case, sentences that other courts have imposed.  I, this

week, sentenced another January 6 defendant, Tony Gill, the

government was asking for two months.  I did not give him the

full two month.  I gave him 45 days.  And he was at the

Capitol for a very, very long time, helping and participating

-- well, encouraging the fighting against the officers in some

of the very, very worst fighting at the Lower West Terrace.

And unlike you, he didn't go to hear a speech, as you did.

He just kind of heard about the riots and decided to go lend a

hand.  I think your case is -- even though you did lie to the

FBI about it, I think your case is a bit different than his.

And so that's one of the cases I've considered.

So, based on my consideration of all the 3553(a) factors,

it is the judgment of the court that you, Spencer Offman, are

hereby committed to the custody of the Bureau of Prisons for a

term of 30 days on Count 1 of the information.

You are further sentenced to serve six months of supervised

release, to pay $500 in restitution to the Architect of the

Capitol, and to pay a mandatory $25 special assessment.  I

will waive imposition of a fine in this case because although

you are -- you don't earn money when you're incarcerated, and

given that you rent a room in a house and you seem to live a

very simple life, I'm not going to impose a fine here.  But I

am going to order that you participate in 60 hours of

community service and that be done in person, not online.

1          The special assessment is immediately payable to the Clerk

2     of the Court for the U.S. District Court of the District of

3     Columbia.  Within 30 days of any change of address, you shall

4     notify the Clerk of the Court of the change until such time as

5     the financial obligation is paid in full.

6          I will recommend to the Bureau of Prisons that you serve

7     your sentence -- is that Sheridan?

8               MS. IMHOLTE:  Correct.

9               THE COURT:  Sheridan.  BOP Sheridan.  I can only make a

10    recommendation to the BOP.  I can't order them to do anything.

11    I wish I could, but I can't.  But I'll make that recommendation

12    that you will be allowed to serve your sentence there, which

13    is close to home.

14         While you're incarcerated -- it's a relatively short

15    sentence, so I'm not sure what kind of programming that you

16    can participate in.  So I'm not going to recommend that you

17    participate in any particular programs while incarcerated.

18    But while on supervised release, you must abide by the

19    following mandatory conditions.

20         You must not commit another federal, state, or local crime.

21    You must not unlawfully possess a controlled substance.  I'm

22    not going to impose drug testing, but I am going to impose --

23    well, I'm going to order that you be assessed for alcohol

24    treatment.  I know you're in treatment now, but sometimes

25    these kinds of events in somebody's life can throw them off

1       track.  I don't want you to be thrown off track.  I think your
2       sobriety is very, very, very important, especially when
3       something stressful like this happens.  So I'm not going to
4       impose a drug-testing condition.

5           You must pay the special assessment that I impose in
6       accordance with 18 U.S.C. § 3013.  You must notify the court
7       of any material change in your economic circumstances that
8       might affect your ability to pay a restitution, and you must
9       make restitution as ordered by the court.

10          In addition, you must not use or possess alcohol during
11      your supervised release period, and you must be assessed for
12      alcohol treatment, outpatient treatment.  If ordered to enroll
13      in such treatment by the probation office, you must complete --
14      enroll in and complete such treatment.

15          You shall remove firearms, destructive devices, or other
16      dangerous weapons from areas over which you have access or
17      control until your term of supervised release is complete.

18          Probation office shall release the presentence
19      investigation report to all appropriate agencies in order to
20      execute the sentence of the court.

21          Does either side have any objection to any of the mandatory
22      or discretionary conditions that I've imposed?  Mr. Burkhead?

23              MR. BURKHEAD:  No objection, Your Honor.

24              THE COURT:  Ms. Imholte?

25              MS. IMHOLTE:  No objection.

1          THE COURT:  Okay.  Mr. Offman, you can appeal your

2    conviction to the court of appeals if you believe that your

3    guilty plea was somehow unlawful or involuntary or if there's

4    some other fundamental defect in the proceeding that was not

5    waived in your plea agreement.

6       You also have the right to appeal the sentence that I've

7    imposed subject to certain rights of appeal that you waived as

8    part of your plea agreement in this case.  If you choose to

9    appeal, you must file an appeal within 14 days after I enter

10   judgment.  If you are unable to afford the cost of an appeal,

11   you may request permission from the court to file an appeal

12   without cost to you.

13      Were there any other counts in the information that require

14   dismissal at this time, Mr. Burkhead?

15          MR. BURKHEAD:  Yes, Your Honor.  There was four counts

16   in total.  Mr. Offman pled to Count 1.

17          THE COURT:  Are you going to move to dismiss the

18   remaining counts?

19          MR. BURKHEAD:  Yes, Your Honor.  I'll do that orally

20   now, and I can follow that up with a written motion if the

21   court would like me to do that.

22          THE COURT:  You don't need a written motion.  An oral

23   motion is fine.

24          MR. BURKHEAD:  All right.  I so move then, Your Honor.

25          THE COURT:  The motion is granted.  The remaining

counts of the information will be dismissed.

Mr. Offman, one of the final things that I have to decide, although the government is not asking for you to be detained pending sentencing, I still have to make that independent determination.  And this is where I told you before about your compliance on pretrial release would be important.

And you have been compliant, and therefore I am going to allow you to remain on release pending your voluntary surrender.  That will be determined by your lawyer and the probation office.  You must surrender on the date you are ordered to do so.  Failure to do so could result in imposition of another charge, the sentence for which would run consecutive to any sentence in this case.

And I'll tell you, in almost every single case where the defendant pleaded guilty to an offense for which there was not mandatory detention, I have allowed them to remain on release, and so far, only one case has a person not shown up, and I believe they'll be located eventually.  But I'm going to allow you to do this because of your compliance on pretrial release.

Now, you must continue to abide by all the conditions of your release.  A failure to do so during this period could result in me revoking your conditions of release; you could begin serving your sentence immediately.  In addition, if that happens, you could also be subject to a contempt of court citation.  And if you commit a new offense while on release

1    pending sentencing, you could be subject to an enhanced

2    penalty.

3        So the long and short of it is continue to comply with your

4    conditions of release, don't get in any trouble, turn yourself

5    in on the date that you're supposed to.  Every now and then

6    I've had motions that something's come up, medical reasons or

7    others that you need to delay that surrender date.  If that

8    happens, you need to have your lawyer file a request for an

9    extension.  Without such an extension from the court, though,

10   you must turn yourself in on the designated day.

11       All right.  Mr. Offman, as I said before, you seem to be

12   a seeker and a searcher, and I know this will continue.  You

13   know, it's definitely an unfortunate result of one of your

14   adventures, but I hope you learn from it and you keep on

15   growing and learning as you have been.

16       One of the things I always tell defendants, and I will tell

17   you the same thing, is Bryan Stevenson once said we're not the

18   worst thing we ever do.  You're not the worst thing you've

19   done.  You're young and you're going to continue to learn and

20   to grow, and I hope you learn from this.  And I have every

21   reason to believe that you will move on past this and live a

22   productive life.  So I wish you good luck in that, sir.

23           THE DEFENDANT:  Thank you, Your Honor.

24           THE COURT:  Anything further?

25           MR. BURKHEAD:  Not from the government, Your Honor.

1          THE COURT:  All right.  Thank you, everyone.  Have a

2     good weekend.

3          MS. IMHOLTE:  Thank you.

4          THE DEFENDANT:  Thank you.

5       (Proceedings adjourned at 11:57 a.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Bryan A. Wayne*
Bryan A. Wayne